IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Varlo Davenport,<br><br>                   Plaintiff,<br><br>v.<br><br>Richard "Biff" Williams et al.,<br><br>                   Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 2:17-cv-15-CW<br><br>District Judge Clark Waddoups |

Before the court is a Partial Motion to Dismiss First Amended Complaint[1] filed by

Defendants Richard "Biff" Williams, Mark Houser, Don Reid, Jeffrey Jarvis, William

Christensen, Del Beatty, Paul Morris, Steve Johnson, Ron Isaacson, Christina Durham, and

Michael Carter. (Mtn. to Dismiss, ECF No. 44.) Defendants seek dismissal of various claims and

parties identified in Plaintiff Varlo Davenport's Amended Complaint, which seeks relief under

42 U.S.C. § 1983 for purported violations of Davenport's First and Fourteenth Amendment

rights. (Amended Complaint, ECF No. 14.) The court held oral argument on Wednesday,

October, 25, 2017. (Minute Entry, ECF No. 64.) After carefully considering the arguments set

forth in the briefs and during oral argument, the court GRANTS in part and DENIES in part

Defendants' motion.

---

[1] The First Amended Complaint is sixty-six pages long, single spaced; and it asserts claims against eleven defendants and five causes of action. Defendants did not move to dismiss Count I (Wrongful Termination Pursuant to 43 U.S.C. § 1983) and only certain Defendants moved to dismiss Counts II through V as discussed herein.

**BACKGROUND**[2]

**1. The Parties**

Davenport was a tenured member of the theater department faculty at Dixie State University (DSU), a public collegiate institution, until December 5, 2014, when DSU administrators initiated termination proceedings against him. (Amended Complaint ¶¶ 21, 25, 27, & 125, ECF No. 14.) He was also eventually charged, jailed, tried, and acquitted for simple assault based on events related to his termination. (*Id.* ¶¶ 256, 280–81, 285–93.) Each of the Defendants, who are named in their individual capacity, was at the time of the events underlying this action employed by or working on behalf of DSU. (*Id.* ¶¶ 8–18.) Richard "Biff" Williams was the President of DSU, Mark Houser was a professor and the Chairperson of the Fine Arts Department, Don Reid was the Director of the Public Safety Department, William Christensen was the Executive Vice President and chief academic officer, Jeffrey Jarvis was the Dean of the School of Visual and Performing Arts, Del Beatty was the Dean of Students, Paul Morris was the Vice President of Administrative Services, Steve Johnson was the Director of Media Relations, Ron Isaacson was the Assistant Director of the Public Safety Department, Christina J. Durham was the Chairperson of the Board of Trustees, and Michael Carter was an Assistant Attorney General for the State of Utah assigned to DSU. (*Id.*) Davenport has also named ten Doe defendants whose names were unknown at the time of the Amended Complaint but whom he believes participated in the events that led to his termination and criminal prosecution in a manner that violated his constitutional rights. (*Id.* ¶ 19.)

---

[2] The factual account set forth is drawn from the amended complaint. (ECF No. 14.) In relaying these alleged facts, the court makes no findings as to their truth.

## 2. Davenport's Employment at DSU

Davenport joined the DSU faculty in 2000 as a professor of theater arts. (*Id.* ¶ 21.) He achieved the academic rank of tenure on July 1, 2008. (*Id.* ¶ 27.) His professional responsibilities included teaching theater and acting classes, and "during his tenure at DSU, Davenport produced, acted in, and directed numerous plays for public audiences at DSU" in which DSU students acted (*Id.* ¶¶ 25, 42.). During oral argument on the instant motion, Davenport's attorney acknowledged that Davenport's position as professor required him to participate in the production of these plays, including instructing the student-actors. Some of the plays included "mature subject matter of a sexual nature, use of profanity, and the depiction of violence." (*Id.*) Davenport alleges that Defendant Houser "professes pious beliefs that profanity, romantic or sexual acts, and acts of violence are serious sins which should not be portrayed" and that Houser targeted Davenport for demotion or termination because the plays Davenport selected conflicted with Houser's beliefs. (*Id.* ¶¶ 48, 50.) Davenport further alleges that when Houser himself was denied tenure in November 2014 by a faculty committee, of which Davenport was a member, Houser set out to undermine the committee, including by further targeting Davenport. (*Id.* ¶¶ 68, 70.)

## 3. The Alleged Events

During the fall semester of 2014, Davenport was teaching an introductory theater class with twelve students whose grades were contingent upon their "ability and willingness to act." (*Id.* ¶¶ 75, 81.) Davenport used the teaching techniques of "physical restraint" and "prior experience." (*Id.* ¶¶ 77–79.) He notified the students of these techniques and encouraged them to say "stop" when these techniques "went too far." (*Id.* ¶¶ 81–82.)

One of the students in the class was C.S., a then seventeen-year-old whose scholarship was contingent upon her academic performance, including her grade in Davenport's class. (*Id.* ¶ 80.) C.S. struggled in Davenport's class, and she was concerned she would earn a failing grade and consequently lose her scholarship. (*Id.* ¶ 84.) On November 21, 2014, C.S. and her acting partner, R.H., were to act out a scene of C.S.'s choosing. (*Id.* ¶ 84.) C.S.'s character was to become emotional and angry, but her performance was "flat," so Davenport used physical restraint and prior experience techniques in attempt to elicit a more emotional performance. (*Id.* ¶¶ 85–86.) As Davenport alleges, "[t]he physical resistance included CS pounding on RH's hands with her fists, a student holding her shoulders in her chair, Davenport gently tugging on her hair, and students touching her eyelashes and pulling her headband." (*Id.* ¶ 86.) C.S. was also made to recall a family member's experience with drugs. (*Id.*) Davenport alleges that after class C.S. traveled home and reported to her parents that "Davenport hated her and had physically and emotionally abused her." (*Id.* ¶ 88.) In response, her mother reported the incident to Houser, who allegedly told her that Davenport had a history of bullying students and promised her C.S. would receive an A in the course. (*Id.* ¶¶ 89, 91, 93.)

At this same time, Houser allegedly began meeting with various DSU administrators, spreading word of Davenport's conduct, investigating the circumstances of C.S.'s claims, and ultimately seeking to have Davenport removed from the DSU faculty. (*Id.* ¶¶ 95–104.) Other administrators and university officials, including Defendant Reid, became involved in the investigation. (*Id.* ¶ 105.)

As a result of the C.S. incident, Houser submitted a complaint against Davenport alleging assault to Defendant Williams, who had the final reviewing authority to fire a tenured faculty

member pursuant to the faculty policy manual but who was not supposed to be involved in early termination proceedings. (*Id.* ¶ 108.) Houser and Reid also discussed the prospect of criminal charges against Davenport; Reid, at that time, believed the facts did not support a criminal case, but nevertheless he offered to file such criminal charges as a defensive move in anticipation of a civil lawsuit. (*Id.* ¶ 110.) Davenport was subsequently terminated, allegedly in a manner inconsistent with DSU policy. (*Id.* ¶¶ 122–189.)

Members of the DSU community had a strong negative reaction to Davenport's firing. Among other acts of support, they began an online petition seeking to have him reinstated. (*Id.* ¶ 198.) Davenport alleges that several of the Defendants took action to bring criminal charges against him for the alleged assault on C.S. to legitimize the firing in response to the backlash. (*Id.* ¶¶ 202–210.) In order to convince the county prosecutors of the merit of the case, Reid and Isaacson began investigating, allegedly using coercive techniques and withholding or destroying evidence that supported Davenport's innocence. (*Id.* ¶ 211.) Williams and Durham also met with the Washington County Attorney in effort to convince him to charge Davenport, allegedly providing false information in the process. (*Id.* ¶¶ 247–48.) Ultimately, the county concluded there was not probable cause and recommended against filing charges. (*Id.* ¶ 251.) Reid then had the case sent to the St. George City Attorney's office. (*Id.* ¶ 252.) The City charged Davenport with one count simple assault on C.S. on April 21, 2015. (*Id.* ¶ 256.)

Davenport alleges significant misconduct during the course of the investigation, both before and after he was charged. He alleges that DSU refused to cooperate during discovery but that it ultimately was made to turn over some 2,000 emails that showed the termination process was unfair and that the criminal investigation was tainted by, among other things, coerced

witness statements and false statements made to the prosecutors by DSU administrators. (*Id.* ¶¶ 278–79.) Nevertheless, Davenport was briefly jailed on July 3, 2016, as a result of the allegedly improper investigation and pending charges. (*Id.* ¶¶ 280–81.) He stood trial for the charges on July 13 and 14, 2016. (*Id.* ¶ 285.) Only two students, including C.S., testified against him; one student, who had been in the class, testified that she did not remember the events and did not remember an assault occurring, while C.S.'s testimony was inconsistent with her prior statements. (*Id.* ¶¶ 286–88.)  Davenport questioned Reid about the disappearance of video footage from the classroom, which Reid denied and for which Davenport now accuses him of giving false testimony on the witness stand. (*Id.* ¶¶ 291–92.) The jury ultimately returned a not guilty verdict (*id.* ¶ 293), prompting Williams to issue a press release acknowledging the verdict but defending DSU's decision to bring the charges and to terminate Davenport as an effort to protect the students. (*Id.* ¶ 294.)

In the wake of his termination, the prosecution, and the publication of the press release, Davenport has been unable to find employment in academia. (*Id.* ¶¶ 296–300.) He now works as a car salesman and anticipates he is no longer employable in a university setting. (*Id.* ¶ 302.) He seeks damages for lost wages and benefits, attorney fees and costs, loss of future earning capacity, damage to his reputation and good name, and emotional stress and mental anguish. (*Id.* ¶¶ 303–306.)

## LEGAL STANDARD

Defendants have moved the court to partially dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(6) and 8(a). Rule 12(b)(6) is an affirmative defense requiring dismissal for "failure to state a claim upon which relief can be granted," while Rule 8(a) speaks

to the form of the allegations, requiring a pleading to feature "short and plain statement[s]" of jurisdiction, the basis for relief, and the relief sought. If a party fails to state a claim as a matter of law or fails to satisfy the procedural requirements of the pleadings, the court must dismiss those claims. When considering a motion to dismiss, the court must "accept all of the well-pleaded allegations in the complaint as true." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 510 (10th Cir. 1998). It "must liberally construe the pleadings and draw all reasonable inferences in favor of the plaintiff," but it is not obligated to "accept conclusory allegations." *Id.*

## ANALYSIS

Davenport seeks relief on the following theories: (1) Defendants Williams, Reid, Christensen, Houser, Beatty and Jarvis violated his Fourteenth Amendment rights by depriving him of his property interest in employment without procedural due process; (2) Defendants Williams, Houser, Reid, Beatty, and Isaacson denied him his Fourteenth Amendment procedural due process protection by fabricating evidence, withholding evidence, and inadequately investigating during the assault prosecution; (3) all Defendants violated his First Amendment free speech protection by retaliating against him for exercising his right to free speech; (4) Defendants Williams, Houser, Reid, Jarvis, Christensen, Beatty, and Durham committed a Fourteenth Amendment procedural due process violation by denying his liberty interest by making stigmatizing statements about Davenport; and (5) various Defendants conspired to commit each of the alleged constitutional violations. (Amended Complaint ¶¶ 308–56, ECF No. 14.) Asserting that they are protected by qualified immunity and that the pleadings are inadequate under § 1983, all Defendants seek dismissal of Counts II and III; Defendants Jarvis, Christensen, Beatty, and Durham seek dismissal from Count IV; and Defendants Johnson,

Durham, and Carter seek dismissal from Count V. (Motion to Dismiss vi, ECF No. 44.) When a government employee raises a qualified immunity defense, the court must determine (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). And in order to properly plead under § 1983, the plaintiff must identify an "affirmative link" between the alleged violation and each individual defendant. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). The court applies these standards in addressing each count from which Defendants seek dismissal.

1. **Count II: Pretrial Violations Are Not Cognizable as Procedural Due Process Violations.**

In his second claim for relief, Davenport alleges Defendants Williams, Houser, Reid, Beatty, and Isaacson are liable to him for violating his Fourteenth Amendment procedural due process rights by withholding favorable evidence, fabricating evidence, and failing to adequately investigate during the prosecution of the alleged assault of C.S. (Amend. Complaint ¶¶ 321–31.) He claims a liberty and property right "to be free from a prosecution based on manufactured probable cause, fabricated evidence, coerced eyewitness statements, perjured testimony, failure to investigate without a reasonable basis for probable cause, and withholding of evidence negating his guilty, and which went to the credibility of the witnesses." (*Id.* ¶ 322.)

The facts alleged and the cases the Amended Complaint cites as a basis for Count II suggest that Davenport's claim is effectively a malicious prosecution claim. (*Id.* ¶ 322 (citing *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2014) (liability for "the constitutional tort of malicious prosecution," without deciding whether violation of the Fourth or Fourteenth

Amendment); *Anthony v. Baker*, 767 F.2d 657 (10th Cir. 1985) (liability "for malicious

prosecution and deprivation of [plaintiff's] constitutional rights"); *Norton v. Liddel*, 620 F.2d

1375 (10th Cir. 1980) (potential liability when private conspirator works with an immune state

official to deprive constitutionally protected rights by bringing criminal charges); *Pyle v. Kansas*,

317 U.S. 213 (1942) (potential liability when petitioner's "imprisonment resulted from perjured

testimony, knowingly used by the State authorities to obtain his conviction, and from the

deliberate suppression by those same authorities of evidence favorable to him"); *Brady v.

Maryland*, 373 U.S. 83 (1963) (prosecutorial nondisclosure of material exculpatory evidence is a

violation of the Due Process Clause of the Fourteenth Amendment); *Clanton v. Cooper*, 129 F.3d

1147 (10th Cir. 1997) (*overruling recognized by Estate of Papadakos v. Norton*, 663 Fed. Appx.

651, 657 (10th Cir. 2016) (unpublished) (liability for coercing confession from a third party that

implicated plaintiff and using it to arrest plaintiff in violation of her Fourteenth Amendment due

process right))). According to the Tenth Circuit, § 1983 claims of malicious prosecution require

the plaintiff to allege a Fourth Amendment violation and to prove "that the defendant initiated or

continued a proceeding against him without probable cause" and "that he was . . . seized."

*Nielander v. Bd. of Cty. Com'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1164–65 (10th Cir.

2009) (citing *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007)); *see also Margheim v. Buljko*, 855

F.3d 1077, 1085 (10th Cir. 2017) ("'[A] t least prior to trial, the relevant constitutional

underpinning for a claim of malicious prosecution under § 1983 must be the Fourth

Amendment's right to be free from unreasonable seizures.'" (quoting *Becker*, 494 F.3d at 914));

*Fisher v. Koopman*, 639 Fed. Appx. 740, 746 (10th Cir. 2017) (unpublished) (concluding that

"*Becker* . . . presents an insurmountable obstacle to the § 1983 claims" and that malicious

prosecution claims must be alleged as Fourth Amendment violations). To the extent Davenport claims he was charged and prosecuted without probable cause, he has not properly pled his claim as a Fourth Amendment violation.

The Tenth Circuit has acknowledged, however, that there may be occasions when the prosecutor acted on probable cause in bringing charges but that the procedure otherwise violated a person's rights. *See Becker*, 494 F.3d at 920. But the only procedure the Due Process clause provides in such cases is a posttrial opportunity for the defendant to clear his or her name, and state court remedies provide such an opportunity. *Id.* at 921; *see also Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013) (determining that facts "conjured up" by an overzealous police officer "to create the illusion of probable cause for an arrest warrant and subsequent prosecution" "could not have been anticipated or prevented pre-deprivation, but a post-deprivation [state] malicious-prosecution claim serves as an effective antidote"). In other words, "[t]he existence of the state remedy flattens the Fourteenth Amendment peg on which [Davenport] now tries to hang his § 1983 malicious-prosecution claim." *Myers*, 738 F.3d at 1193. Therefore, the facts Davenport has alleged may support a malicious prosecution claim under Utah tort law, *see Hodges v. Gibson Products Co.*, 811 P.2d 151, 156 (Utah 1991) (identifying the elements of malicious prosecution); *see also Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987) (acknowledging that anyone who was "actively instrumental in putting the law in force" may be liable for malicious prosecution (internal quotations marks and citation omitted)),

but he has not suffered a procedural due process violation.[3] Thus, Count II fails the first step of the qualified immunity analysis.

Despite *Becker* and its progeny effectively limiting pretrial procedural violations to the Fourth Amendment and posttrial claims to state torts, Davenport insists *Anthony v. Baker*, 767 F.2d 657 (10th Cir. 1985), demonstrates that he suffered a procedural due process violation. (Resp. to Mtn. Dismiss 2–5, ECF No. 50.) While the relief Davenport seeks and the circumstances he alleges closely reflect *Anthony*—after an acquittal, the Tenth Circuit concluded a § 1983 due process violation claim should not have been dismissed because a due process violation could have occurred when detectives conspired to bring Anthony to trial based on fabricated evidence and false testimony because "the misuse of legal procedure [was] so egregious," *id.* at 662–63, 665—*Anthony* was implicitly overruled by *Albright v. Oliver*, 510 U.S. 266 (1994) and *Becker*. *See Estate of Papadakos*, 663 Fed. Appx. at 657 & n.5 (observing that *Becker* implicitly overruled *Clanton*, which Davenport's Amended Complaint also cites, to the extent it upheld a substantive due process violation based on the use of an involuntary confession to arrest and imprison plaintiff without considering whether such a claim could

---

[3] It is less clear whether Davenport could state a claim for a substantive due process violation. In *Becker*, the court considered whether the plaintiff's substantive due process rights had been violated by the state officials who "engaged in a groundless investigation designed to obtain civil penalties from her and withheld material evidence tending to exonerate her." *Id.* at 922. It concluded no such violation had occurred, without precluding the possibility of such a violation, because the plaintiff had not shown that the claims arising from the investigation were such an affront to her "personal autonomy" as to be "'truly conscience shocking'" as substantive due process requires and because she had not shown the suppression of exculpatory evidence affected the outcome of her trial given that the charges against her were dropped and did not proceed to trial. *Id.* at 923–24 (citation omitted). In a more recent, unpublished decision, the Tenth Circuit cited *Becker* in concluding that there is "no substantive due process right under the Fourteenth Amendment to remain free from being arrested for, or charged with, a crime based on the allegedly coerced statements of a third party." *Estate of Papadakos v. Norton*, 663 Fed. Appx. 651, 658 (10th Cir. 2016) (unpublished). The court reaches no conclusion about the viability of such a claim, as Davenport has not alleged a substantive due process violation and insisted through counsel at oral argument that he intended only to bring a procedural claim.

survive *Albright*). Because *Anthony*'s holding is directly contradicted by later Tenth Circuit precedent, this court is not bound by it. Count II is DISMISSED with prejudice.

## 2. Count III: The Relevant Speech Was Pursuant to Davenport's Official Duties.

Davenport next alleges that all Defendants violated his First Amendment right to freedom of speech by retaliating against him for selection and production of purportedly salacious or immoral plays.[4] (Amended Complaint ¶¶ 332–41, ECF No. 14.) Although a public employer may, in certain circumstances, limit the words and actions of its employees, "the First Amendment protects a public employee's right, in [other] circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 417, 417 (2006). Therefore, "a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." *Dill v. City of Edmond*, 155 F.3d at 1193, 1201 (10th Cir. 1998).

To determine whether an employer's action against its employee constitutes improper retaliation, the court must apply the five-prong *Garcetti/Pickering* test, which requires the following:

> First, the court must determine whether the employee speaks pursuant to his official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine

---

[4] In his Amended Complaint, Davenport also states his termination was retaliation for his teaching methods. At oral argument, however, his counsel stated that Davenport was abandoning that argument.

whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Couch v. Bd. of Trustees of Mem'l Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (quoting *Brammer-Hoetler v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202–03 (10th Cir. 2007)). The first three prongs present issues of law to be decided by the court, while the final two are generally questions of fact. *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010).

Here, Davenport's speech was "pursuant to his official duties" and therefore not constitutionally protected, meaning that there has been no First Amendment violation even if he was fired for his speech. Although there is no bright line rule, the Tenth Circuit interprets "pursuant to his official duties" broadly and has said that the "ultimate question" in making that determination is "'whether the employee speaks as a citizen or instead as a government employee." *Id.* at 746 (quoting *Brammer-Hoetler*, 492 F.3d at 1203). The court has also said a public employee speaks pursuant to his or her official duties when the relevant speech "stemmed from and was of the type that the employee was paid to do." *Rohrbough*, 596 F.3d at 746.

The Amended Complaint does not provide a detailed description of Davenport's duties, but it states that they include teaching theater and acting and that "[d]uring his tenure at DSU, Davenport produced, acted in, and directed numerous plays" that "largely" involved DSU students as actors. (Amended Complaint ¶¶ 25 & 42, ECF No. 14.) And during oral argument,

Davenport admitted that preparing students to participate in the plays was a part of his occupation. Therefore, no reasonable inference can be drawn other than that the plays he now alleges were constitutionally protected speech were within the scope of his official duties.

Davenport argues, however, that his speech was protected because the plays were performed for a public audience and because the faculty policy manual extends to the faculty the academic freedom to make teaching decisions and protects professors from interference in their presentation of controversial materials. (Resp. to Mtn. Dismiss 7–8, ECF No. 50.) First, while the intended audience of the speech may sometimes indicate whether speech was pursuant to official duties, here that the audience was the general public and not just DSU students or faculty is irrelevant because the speech Davenport alleges as the basis for his termination is not just the plays themselves, but his role in putting them on. If he was expected, as a part of his job description and compensation, to select and put on plays, the audience is irrelevant. Second, his argument that his termination in violation of this statement from the policy manual constitutes a First Amendment violation is without merit. While termination under such circumstances may present a breach of contract, or even a Due Process violation, the First Amendment does not protect him. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir. 2005) ("Thus, the right to academic freedom is not cognizable without a protected free speech or associational right."). Neither of these arguments changes the fact that Davenport's involvement with these plays was on behalf of DSU and that he was compensated for his work on them. Therefore, the alleged speech was within the scope of his official duties. Because the court concludes no First Amendment violation occurred, it declines to consider the remaining prongs of the

*Garcetti/Pickering* analysis as well as Defendants pleading argument. Count III is DISMISSED with prejudice.

### 3. Count IV:  Davenport Has Not Pled Sufficient Facts that Defendants Beatty, Christensen, and Jarvis Published Stigmatizing Statements About Him; He Has Pled Facts Supporting an Inference that Durham Published Stigmatizing Statements.

Davenport alleges in Count IV that Defendants Williams, Reid, Houser, Jarvis, Christensen, Beatty, and Durham deprived him of his liberty interest in his good name and reputation by making defamatory statements in the course of his termination. (Amended Complaint ¶¶ 342–43, ECF No. 14.) Defendants Beatty, Christensen, Jarvis, and Durham argue for dismissal, claiming Davenport has not pled a constitutional violation.[5] (Mtn. to Dismiss 8–12, ECF No. 44).

The Due Process clause of the Fourteenth Amendment protects public employees' "liberty interest in their reputations, but only in the context of their employment." *Coleman v. Utah State Charter School Bd.*, 673 Fed. Appx. 822, 829 (10th Cir. 2016) (unpublished). But not all negative statements about a person implicate a liberty interest. To determine whether statements about a public employee's reputation or character implicate a liberty interest, the court must apply the following test:

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.

---

[5] Defendants Williams, Reid, and Houser do not move for dismissal of Count IV.

*Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted). If a plaintiff establishes each element, due process requires that he or she be afforded a name-clearing hearing. *See id.* at 480. Failure to provide such a hearing is a constitutional violation. *See id.*

A statement "impugn[s] the good name, reputation, honor, or integrity of the employee" if it makes allegations of "dishonesty or immorality that might seriously damage [the] employee's standing . . . in the community." *Hicks v. City of Watonga*, 942 F.2d 737, 746 (10th Cir. 1991). At issue here is whether Beatty, Christensen, Jarvis, or Durham published any such statements, as failure to allege publication would "doom[] this claim." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 n.13 (1985). A statement is "published" if it is "made public." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). But a statement is not "made public" if there is no indication that it was made "outside the state government." *Asbill v. Hous. Auth. of the Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984). "[S]uch intra-government dissemination, by itself, falls short." *Id.* Each of the four Defendants who move for dismissal of Count IV are addressed below.

   a.  *Beatty*

Davenport does not allege that Beatty communicated with anyone other than members of the DSU administration. Rather, according to Davenport, Beatty's communications were entirely with administrators and students. Beatty claimed to have student complaints from a six-year period, which claim he repeated to Houser, Jarvis, and Williams. (Amended Complaint ¶¶ 96–98, 236, ECF No. 14.) Beatty also spoke with C.S. and then relayed their communication to Houser and Jarvis. (*Id.* ¶ 106.) He helped draft the complaint to the faculty review board about Davenport's conduct and to compile supporting documents, and his claims of student complaints

were included in that complaint. (*Id.* ¶¶ 98, 122, & 146.) Finally, Beatty allegedly told Williams that some students had reported that Davenport bullied them and had a reputation for being a bully, knowing that Williams would use this to prosecute Davenport. (*Id.* ¶¶ 236–37.)

In each of these communications, Beatty was addressing a party employed by DSU who had responsibility for Davenport's employment. These were intragovernmental communications and therefore were not "made public." *Cf. Harris v. Blake*, 798 F.2d 419, 422 n.2 (10th Cir. 1986) (concluding that a letter placed in a student's university file that called his character into question was not published because the letter was not "disseminated to anyone not connected with" his particular academic program). While Davenport could argue that Beatty's statements about bullying were published because he knew they would be used to prosecute Davenport, Beatty did not personally communicate beyond the DSU administration[6] and his communication with Williams, his superior, was not public. *See Custodio v. Parker*, 65 F.3d 178 (10th Cir. 1995) (unpublished table decision) ("The allegation that false statements were made to plaintiff's superiors similarly fails to state a claim because 'intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication . . . .'" (quoting *Asbill*, 726 F.2d at 1503)). Therefore, Davenport has not alleged Beatty published any stigmatizing statements.

*b. Jarvis*

Davenport alleges that Jarvis communicated about C.S. and about the goal of terminating Davenport with other members of the administration, including calling for Davenport's termination, but not that he communicated with anyone outside of DSU. (*Id.* ¶¶ 98, 122, 129–30.) Jarvis also communicated with Davenport himself regarding his termination (*Id.* ¶¶ 124,

---

[6] While the court acknowledges the individual faculty members who comprise the Faculty Review Board are not a part of the "administration" per se, they were serving on a committee involved in administering university affairs.

129.) Jarvis also spoke with an assistant attorney general, Defendant Carter, in preparation for the faculty review board hearing, but the purpose of that communication was to discuss whether materials not a part of Davenport's employment file could be used against him. (*Id.* ¶ 152.) The Amended Complaint makes no suggestion that stigmatizing statements were made during that meeting. Additionally, Jarvis's meeting with Carter was to allow Carter to advise his client on an evidentiary matter pertaining to the faculty review board hearing. Therefore, their communication likely would have been protected by attorney-client privilege and not been public. Finally, Jarvis communicated with the faculty review board, detailing the alleged assault on C.S. and advocating for Davenport's termination. (*Id.* ¶ 161.) Although Jarvis made statements that cast a shadow on Davenport's character, no such statements were made available to the public. They were intragovernmental and not published.

   c. *Christensen*

   Davenport alleges that Christensen terminated his employment before the faculty review board hearing upon instruction from Williams and that Christensen then discussed drafting a complaint to the faculty review board with Jarvis. (*Id.* ¶¶ 124 & 129.) He also alleges that Christensen withheld information from and supplied false information to Davenport that could have impeded his preparation for the hearing. (*Id.* ¶¶ 139, 142, 143, 145, 154, 158–59.) Like Jarvis, Christensen met with Carter. (*Id.* ¶ 152.) Christensen also directed other members of the administration in investigating C.S.'s alleged assault and directed another professor to halt student work on an assignment to investigate the circumstances of Davenport's termination. (*Id.* ¶ 209.) While Christensen appears to have been an integral part of Davenport's termination and likely made stigmatizing statements in the process, Davenport never alleges that Christensen

spoke with anyone other than DSU administrators, the attorney acting on behalf of DSU, and Davenport himself. For reasons previously articulated, none of these communications were made public.

### d. Durham

The only communication the Amended Complaint attributes to Durham is the conveyance of false information about the alleged assault on C.S. to the Washington County Prosecutor. (*Id.* ¶ 248.) Specifically, the Amended Complaint states that Durham agreed to attend the meeting with Williams "to try and convince [the prosecutor] to file criminal charges against Davenport" and that she and Williams then "met with [the prosecutor] and provided false information about Davenport trying to convince him to file criminal charges against Davenport." (*Id.* ¶¶ 247–48.) Although the allegation is in the passive voice, which calls into question whether Durham herself actually made any statements, taking all inferences in favor of Davenport as the nonmoving party, the allegation stands for the proposition that Durham made a communication related to the prosecution of Davenport. The Amended Complaint also supports that any such statement would have been both stigmatizing and false. (*See id.* ¶ 228.) It stigmatized him by implicating his morality in a manner that damaged his standing in the community. That is, a professor accused of abusing a student whose education he was charged with promoting would unlikely be able to gain future employment as a professor. *See Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir. 1991). Further, the statements supporting prosecution was false and intended to provide cover for the allegedly improper firing of Davenport, not because Davenport actually committed such an assault. (*Id.* ¶¶ 194–196, 202, 228, 248.) Finally, Davenport has not been able to find work in academia since his termination

from DSU. (*Id.* ¶¶ 299–302.) Therefore, Davenport has adequately pled the first three elements of a liberty interest in his reputation.

He also has sufficiently pled that she published to survive a motion to dismiss. Because her communication extended beyond DSU there is at least a plausible inference that the statements were "made public," because it was beyond the government entity where Davenport was employed to a county, not state, employee. *See Asbill*, 726 F.2d at 1503. Defendants point the court to *McCarty v. City of Bartlesville*, 8 Fed. Appx. 867, 874 (10th Cir. 2001) (unpublished), in support of their argument that Durham's communication with the prosecutor was intragovernmental and therefore not published. In *McCarty*, two members of the city's police force alleged the police chief made stigmatizing and untrue statements to a prosecutor by seeking to have criminal charges filed for the conduct for which the plaintiffs were terminated. *Id.* Without analysis of the nature or content of the communication, the Tenth Circuit concluded that the chief's discussions with the district attorney were not public because they were intragovernmental. *Id.* (citing *Asbill*, 726 F.2d at 1503). The court further acknowledged that the communication from the district attorney to the public at large was not a publication because public court documents are absolutely privileged. *Id.* Therefore, it concluded the discussion between the police chief and prosecutor was not published. *Id.*

Here the facts are distinct from *McCarty*. The duties of a police officer include working with prosecutors to prepare cases to be prosecuted. As the Chairperson of DSU's Board of Trustees, Durham had not such duty. Rather, the Amended Complaint supports an inference that she attended the meeting to serve as leverage to encourage a maliciously motivated prosecution. (Amended Complaint ¶ 228, ECF No. 14.) And there is no relationship between university

trustee and prosecutor that requires the free flow of communication as there is between police officer and prosecutor. Because of this factual distinction, and because *McCarty* is unpublished and would not bind the court even if there were no such factual distinction, Durham should remain a party to Count IV at this early stage of the litigation so that the facts and law on this issue can be further developed. The court makes no findings or conclusions that would preclude Durham from raising future arguments about the scope of the intragovernmental exception.

In sum, even assuming Defendants Beatty, Jarvis, and Christensen made statements that satisfy the first three elements, Davenport has not pled that these three defendants have published any such statements. Therefore, Beatty, Jarvis, and Christensen are DISMISSED from Count IV. But Davenport has pled sufficient facts to support an inference that Durham's statements were published, so she remains a party to Count IV.

### 4. Count V: Davenport Has Adequately Pled Conspiracy.

Finally, Defendants Johnson, Durham, and Carter move to dismiss Count V,[7] which in relevant part alleges that each of the moving Defendants conspired to commit the constitutional violations alleged in Counts II, III, and IV. Defendants argue that Davenport has not met the § 1983 pleading requirements for conspiracy. During oral argument, counsel for Davenport stipulated to the dismissal of Johnson. Therefore, Defendant Johnson is DISMISSED from Count V.

To state a claim for § 1983 relief on a conspiracy theory, a plaintiff "must allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kansas*

---

[7] During oral argument, Defendants suggested Morris and Isaacson should also be dismissed from Count V. The court declines to consider dismissal of those Defendants because "'issues may not be raised for the first time at oral argument.'" *Dodds v. Richardson*, 614 F.3d 1185, 1208 (10th Cir. 2010) (quoting *United States v. Abdenbi*, 361 F.3d 1282, 1290 (10th Cir. 2004)). The remaining Defendants did not move to dismiss Count V.

*Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). The court must balance the need to protect public officials from frivolous allegations with the difficulty of stating a claim for conspiracy before discovery. *See Hunt v. Bennet*, 17 F.3d 1263, 1268 (10th Cir. 1994). In balancing these concerns, the Tenth Circuit has observed "the inherent difficulty of producing direct evidence of a conspiracy and therefore proceed[ing] with caution in considering the pre-trial dismissal of" a § 1983 conspiracy claim but required "facts tending to show agreement and concerted action," not "mere conclusory allegations." *Id.* The pleadings must demonstrate that the alleged conspiracy had "a single plan, the essential nature and general scope of which" each participant knew. *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir.1990). But it does not require that the participants know the "exact limits of the illegal plan." *Id.*

Given the court's obligation to assume the truth of the facts stated and to draw all reasonable inferences in favor of Davenport, his claims against Durham and Carter are sufficient to avoid dismissal and proceed to discovery. With respect to Durham, Defendants argue that Davenport has failed to allege any facts that would support that she knew the falsity of the claims against Davenport during the meeting with Williams and the Washington County prosecutor. (Mtn. to Dismiss 4–5, ECF No. 44.) They suggest there could have been no meeting of the minds between Durham and Williams to mislead the prosecutor without such knowledge. (*Id.* at 5.) But there is sufficient basis to infer that she knew her presence was needed to persuade the prosecutor, indicating an agreement to compel prosecution regardless of the merits of the claims against Davenport.  Because the Amended Complaint sets out sufficient facts from which one can draw a reasonable inference that Durham intended to use her position to compel the county prosecutor to take action against Davenport on the basis of information provided to her by

Williams and given the difficulty of providing evidence of conspiracy at this stage of litigation, Davenport has sufficiently alleged Durham's involvement in a conspiracy. Defendants' motion as to Durham is DENIED.

With respect to Carter, Defendants argue Davenport has failed to plead he was party to an agreement or took concerted action in furtherance of such an agreement because he has not alleged Carter published false or stigmatizing statements. (*Id.*) While the Amended Complaint does not directly attribute any stigmatizing statements to Carter, it alleges that he agreed with Defendant Williams to perpetuate the stigma by withholding emails that would undermine the case against Davenport. (Amended Complaint ¶¶ 269–71, ECF No. 14.) It is fair to infer that Carter was aware of Williams's efforts to validate Davenport's termination by bringing post hoc assault charges, given he attended a meeting to where pressure from the faculty was discussed in conjunction with the difficulty of proving assault and that he acted on behalf of the plan by withholding evidence. (*Id.* ¶¶ 202, 209, 269–71.) Therefore, Davenport has sufficiently pled conspiracy as to Defendant Carter, and Defendants' motion is DENIED as to Carter.[8]

## CONCLUSION

In sum, Defendants' motion is GRANTED in part and DENIED in part. It is GRANTED as to Counts II and III and those counts are DISMISSED. It is GRANTED as to Beatty, Jarvis, and Christensen in Count IV; therefore, those Defendants are DISMISSED from Count IV. It is DENIED as to Durham in Count IV. It is GRANTED as to Johnson in Count V, and he is DISMISSED from Count V. It is DENIED as to Carter and Durham in Count V.

---

[8] Defendants also argue for dismissal of the conspiracy count against Carter because Counts II and III failed. While the court has dismissed those claims, it declines to dismiss Count V on this basis because Defendants have not sought piecemeal dismissal. Because it is possible for Durham and Carter to be liable for conspiracy on Count IV, the court declines to dismiss them from the Count V.

DATED this 20th day of November, 2017.

BY THE COURT:

_____

Clark Waddoups
United States District Judge